MORRIS, Judge.
 

 Alterra Healthcare Corporation, n/k/a Brookdale Senior Living Communities, Inc.; Eric Flock; and Fancie Cales (collectively Alterra) appeal a final judgment entered in favor of Michelle Campbell in her malicious prosecution action. We affirm and write only to address the issues of probable cause and legal cause as elements of a malicious prosecution action.
 

 I. FACTS
 

 In March of 2002, Campbell began working as a floor nurse at Alterra’s Clare Bridge assisted living facility. It was there that she met Cales, the health care coordinator and Campbell’s direct supervisor. The working relationship between Cales and Campbell was initially pleasant but soon became strained, and Campbell ultimately resigned due to workplace conflict with Cales. Campbell thereafter became employed with Maxim Healthcare, a temporary nursing agency.
 

 In May 2004, Flock, who was residence director of Alterra’s Sterling House facility, contacted Maxim to request a temporary nurse for the 3:00 p.m. to 11:00 p.m. shift. Maxim assigned Campbell to work the shift. Upon Campbell’s arrival, Cales, who was then a nurse supervisor at Sterling House, approached Flock and asked him to send Campbell home. Cales told Flock that she had worked with Campbell at a prior facility and that she was “bad news.” Cales also told Flock that Campbell had been suspected of stealing narcotics from that facility. Flock responded that Campbell would work the shift unless Cales intended to fill in.
 

 At the start of the shift, Campbell and off-going nurse, Annette Prince, conducted a med count of the medications prescribed for Sterling House patients. Most of the residents’ medications were prepackaged in blister packs for ease of dispensation and control. The pharmacists would place each tablet into a blister on a card containing the residents’ name and prescription information; the pills would be secured in place with a foil seal on the back of the card. Tablets were dispensed from the card by pushing them through the foil seal. The individual pill compartments were numbered on the blister packs so that the nurse or medical technician (a nonnurse authorized to handle medications) could determine at a glance the number of remaining pills on the card by looking at the printed number next to the last unused pill. The blister packs were stored in a locked, removable box that itself was stored inside a locked medication cart. The medication cart was kept in the nursing station. The door to the nursing station would automatically lock whenever a nurse or medical technician left the room. Sterling House maintained three sets of keys to the nursing station, medicine cart, and medication lock box. One set was carried by the nurse or medical technician on duty, another set was kept in Flock’s office, and a third set was maintained by the pharmacist.
 

 To begin the med count, Prince read aloud from a log book the number of pills that each card should contain while Campbell compared the printed number on the blister packs to the number read by Prince. Neither Campbell nor Prince looked at the pills or made any physical examination of the blister packs for evidence of tampering. The parties stipu
 
 *599
 
 lated that simply counting the medications and not checking the blister packs for tampering was the written procedure which was routinely followed at Sterling House. After the med count was completed, Prince signed the log book, gave Campbell the keys, and left. Shortly thereafter, Campbell signed the log book.
 

 Sometime between 4:30 and 5:00 p.m., Cales asked Campbell for the keys to the nursing station to access some charts. She returned the keys to Campbell about ten minutes later. Campbell also gave her keys to another employee several times during the course of her shift so that the employee could access necessary items from the nursing station and so that the employee could lock the facility. Flock also had his own set of keys to the nurses’ station, medication cart, and lock box, and he was in the building until 6:00 p.m.
 

 At the end of her shift, Campbell performed the count procedure again with Maria Collazo, the incoming medical technician. Campbell read aloud from the log book, and Collazo matched the numbers. There is conflicting information in the record about what happened next. According to a Florida Department of Health (DOH) investigator,
 
 [1]
 
 Collazo reported that she noticed that some of the blister packs appeared to have been opened and then taped back together. The investigator further relayed that Collazo refused to sign the log book but that Campbell signed it, turned her keys over to Collazo, and left.
 

 Campbell, on the other hand, testified that she and Collazo discovered a medication error resulting from one patient’s receiving the wrong dosage of medication. Campbell testified she asked Collazo to call a supervisor to discuss incident reporting procedures; Collazo called Prince. Campbell then left a message for Cales on her voicemail. Campbell testified that after starting to complete an incident report, she and Collazo finished the med count “with no further problems.” Campbell then turned her keys over to Collazo, signed the log book, and left. Campbell testified she believed Collazo signed the log book at that time as well, though she acknowledged she did not actually see her do so. Campbell testified she did not learn that any drugs were missing until Maxim notified her two days later.
 

 Prince told the DOH investigator that after Campbell left the facility, Collazo called Prince to inform her that there was a problem with some of the blister packs. Prince arrived at the facility around 11:20 p.m. and observed that two of the blister packs had tape on them. Cales called Flock that same evening to advise him of the problem with the med count. Flock then called Collazo and instructed her to place the blister packs back into the medicine cart so he could inspect them himself the next morning.
 

 The next day, Flock brought the blister packs to the pharmacist, John Gattoline, and told him that the blister packs appeared to be “falling apart.” After studying the blister packs, Gattoline informed Flock that someone had tampered with the blister packs and replaced several of the oxycodone and hydrocodone pills with potassium and cardizem pills. Flock reported this to his supervisor Pam Cutsuries who then contacted their legal department. According to Cutsuries, Sterling House experienced an average of five drug thefts a month. Upon reporting the matter to their legal department, Cutsuries was told to contact law enforcement and to not let Campbell back into the facility. Cutsuries then instructed Flock to call the police and to instruct Maxim House that Campbell
 
 *600
 
 would not be permitted to work at Sterling House during the pendency of the investigation.
 

 Flock did not talk with Campbell, request that any employees submit to drug screening, or otherwise conduct any investigation. Flock contacted the Hillsbor-ough County Sheriffs Office on May 7, 2004, to report the incident.
 

 Deputy Stempowski met with Flock and Cales and was told that the theft was discovered at the end of Campbell’s shift. Cales advised that the nurses inspected the blister packs for tampering before signing the log book and that by doing so, the nurse was representing that there was nothing suspicious about the medications. Cales also advised that the tampering was obvious and would have been discovered during the medication count if it occurred before Campbell’s shift. Flock and Cales further advised that Campbell was the only person with access to the medications during her shift. Flock informed Deputy Stempowski that Cales told him at the beginning of Campbell’s shift that she was “bad news” and was suspected of stealing narcotics from her prior facility.
 
 [2]
 
 Cales added that Campbell was “let go for unknown reasons” from the prior facility. Cales also told Deputy Stempowski, in Flock’s presence, that Sterling House had never had missing drugs before Campbell worked in the facility. Neither Flock nor Cales told Deputy Stempowski that they both were in the building during Campbell’s shift or that another employee was also in the building.
 

 Deputy Stempowski then interviewed Prince who said that the blister packs were in order when she counted them at the end of her shift. Prince said that the blister packs did not have the tape on them and that she did not notice that different pills had been inserted. Although Prince told Deputy Stempowski that the blister packs did not look the same as they had when she ended her shift, she also later admitted to the DOH investigator that the tape on the blister packs was not obvious, could have been on the blister packs for days, and that the pills did not look as though they had been replaced. She acknowledged that “it was possible that the blister packs had been tampered with prior to Campbell’s shift.”
 

 Based on the information provided to her, Deputy Stempowski documented that the theft occurred during Campbell’s shift and that the theft was therefore attributed to Campbell.
 

 Two days later, Campbell’s supervisor at Maxim informed her that Sterling House had discovered that hydrocodone and oxy-codone pills had been switched out for other pills in some of the blister packs. In accordance with standard procedure, Campbell voluntarily submitted to a urine drug screen, which'was negative.
 

 Campbell was ultimately arrested and charged with repackaging an adulterated or misbranded drug, trafficking in oxyco-done, causing a drug to be a counterfeit, obtaining a controlled substance by subterfuge, and furnishing a false controlled substance form. The criminal report affidavit indicated that the theft occurred during Campbell’s shift and that Campbell had exclusive access to the drugs and that those factors supported a probable cause determination. The parties do not dispute that at Campbell’s first appearance, the judge ruled that there was insufficient probable cause for Campbell’s arrest and released her on her own recognizance.
 
 *601
 
 Once Campbell was released from jail, she attempted to go back to work at Maxim but was told she was fired.
 

 The criminal case continued for nearly seven months until it was ultimately dropped in December 2004 by the State Attorney’s office with a letter of release. After the charges were finally dropped, Campbell again contacted Maxim to get her job back. She appealed all the way to Maxim’s general counsel in Maryland, but the company refused to rehire her. She then sought employment with other temporary nursing agencies but was required to disclose her arrest as part of the prospective employer’s criminal background procedures. None of the temporary agencies ever called her back. She also applied to the Taylor County Correctional Institute (TCCI) but was not hired. The director of nursing at TCCI testified that a felony arrest would have been investigated further and that a felony arrest, especially one dealing with the theft of narcotics, may result in an applicant’s not being hired.
 

 In the interim, another drug theft occurred at Sterling House and in similar fashion, hydrocodone pills were replaced with potassium pills. Flock testified that he was instructed not to investigate this theft and not to require his employees to submit to drug screening. He did not notify Campbell or her attorneys or the State Attorney’s Office. He did, however, tell the detective assigned to Campbell’s case. Flock testified that the detective told him his services were no longer needed. About a month after the second tampering incident, another theft was discovered involving the prescription drug Endocet being replaced with Tylenol tablets. Flock had two employees screened for drugs. One of the employees’ drug screens was positive, and she was terminated. According to the log book, that same employee had worked two shifts before Campbell on the day in question and had worked in close proximity to discovery of the second and third thefts. Flock never told Campbell, her attorneys, the State Attorney’s office, or law enforcement about the incident with the other employee.
 

 Campbell ultimately filed her malicious prosecution action against Alterra, and the jury returned a verdict in Campbell’s favor, finding that Cales and Flock maliciously instituted and continued a criminal proceeding against Campbell without probable cause. The jury awarded Campbell $864,537 for compensatory damages and $175,000 in aggregate punitive damages against the various defendants, for a total award of $589,657. The trial court denied Alterra’s motion to set aside verdict or in the alternative for judgment notwithstanding the verdict, and the trial court entered the final judgment against Alterra and Flock.
 
 [3]
 

 II. ANALYSIS
 

 A. Standard of review
 

 “The standard of review of a trial court’s ruling on a motion for judgment notwithstanding the verdict is
 
 de novo.” Specialty Marine & Indus. Supplies, Inc. v. Venus,
 
 66 So.3d 306, 309 (Fla. 1st DCA 2011) (citing
 
 Hancock v. Schorr,
 
 941 So.2d 409, 412 (Fla. 4th DCA 2006);
 
 McQueen v. Jersani,
 
 909 So.2d 491, 492-93 (Fla. 5th DCA 2005)). “A [judgment notwithstanding the verdict] is appropriate only in situations where there is no evidence upon which a jury could rely in finding for the
 
 *602
 
 non-movant [sic], A jury verdict must be sustained if it is supported by competent[,] substantial evidence.”
 
 Hancock,
 
 941 So.2d at 412 (citation omitted).
 

 B. Campbell met her burden to prove that there was an absence of probable cause for the original proceedings and that Alterra was the legal cause of the proceedings.
 

 In order to prevail in a malicious prosecution action, a plaintiff must establish that: (1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding.
 
 Burns v. GCC Beverages, Inc.,
 
 502 So.2d 1217 (Fla.
 
 1986); Adams v. Whitfield, 290
 
 So.2d 49 (Fla.1974). The failure of a plaintiff to establish any one of these six elements is fatal to a claim of malicious prosecution.
 

 Alamo Rent-A-Car, Inc. v. Mancusi,
 
 682 So.2d 1352, 1355 (Fla.1994). Here, we are concerned with two elements: probable cause and legal cause.
 

 In addressing probable cause first, we note that “ ‘[w]hat facts and circumstances amount to probable cause is a pure question of law. Whether they exist or not in any particular case is a pure question of fact. The former is exclusively for the court; the latter for the jury.’ ”
 
 Glass v. Parrish,
 
 51 So.2d 717, 722 (Fla. 1951) (quoting
 
 Cleveland, C., C. & St. L. Ry. Co. v. Dixon,
 
 51 Ind.App. 658, 96 N.E. 815, 816 (1911));
 
 see also Cold v. Clark,
 
 180 So.2d 347, 349 (Fla. 2d DCA 1965) (explaining that issue of probable cause is mixed question of law and fact). Where the facts are in dispute, the issue must be submitted to the jury.
 
 See Glass,
 
 51 So.2d at 722;
 
 Cold,
 
 180 So.2d at 349;
 
 Kilbum v. Davenport,
 
 286 So.2d 241, 243 (Fla. 3d DCA 1973). But the legal effect of the facts, “when found or admitted to be true, is for the court to decide as a question of law.”
 
 Cold,,
 
 180 So.2d at 349 (citing
 
 Anderson v. Bryson,
 
 94 Fla. 1165, 115 So. 505, 506 (1927)).
 

 To satisfy this element, the plaintiff must prove that “the criminal proceeding was initiated by the defendant without probable cause, i.e., without a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.”
 
 Burns v. GCC Beverages, Inc.,
 
 502 So.2d 1217, 1219 (Fla. 1986). Indeed, “[a] lack of probable cause may be established by proof that a criminal proceeding was instituted on facts that could as well be explained innocently.”
 
 Harris v. Lewis State Bank,
 
 482 So.2d 1378,1382 (Fla. 1st DCA 1986).
 

 Because a malicious-prosecution defendant’s good faith is “an essential element to be considered on the question of probable cause,”
 
 Glass,
 
 51 So.2d at 720, if it appears that further investigation is justified before instituting a proceeding, “liability may attach for failure to do so.”
 
 Harris,
 
 482 So.2d at 1382.
 

 In this case, there were facts presented which could suggest that Campbell was the person responsible for the tampering with and the theft of the drugs. But there was also evidence that she was not
 
 *603
 
 the only person who had access to the area where the drugs were stored on the night in question. Indeed, at least three other people — Cales, Flock, and another employee — had access to the storage area. And one of those people, Cales, had a known rancorous history with Campbell. Despite this, Flock failed to contact Campbell about the incident, conduct drug screens on the other employees, or otherwise conduct any other investigation.
 

 Other evidence which suggests that probable cause was lacking is the fact that Campbell performed the med count in accordance with Sterling House’s written procedures which, at the time, did not require her to physically examine the blister packs for signs of tampering. And even Prince acknowledged that the tampering was not evident, that the tape could have been there for days, and that the tampering could have occurred prior to Campbell’s shift. Under these facts, the jury could — and apparently did — conclude that a further investigation was necessary because the criminal proceedings against Campbell were instituted on facts “that could as well be explained innocently.”
 
 Harris,
 
 482 So.2d at 1382. Consequently, there was competent, substantial evidence that Alterra lacked probable cause to initiate the criminal proceedings.
 
 [4]
 

 Likewise, there was competent, substantial evidence that Alterra was the legal cause of the criminal proceedings. In a malicious prosecution action, the element of legal causation is established where a defendant gave information to authorities which he or she knew or should have known to be false which was “the determining factor in inducing the [arresting] officer’s decision.”
 
 Orr v. Belle Lindsey Stores, Inc.,
 
 462 So.2d 112, 114 (Fla. 5th DCA 1985);
 
 Buchanan v. Miami Herald Publ’g Co.,
 
 230 So.2d 9, 11 (Fla.1969) (noting that “[a]ctual knowledge is not required” and holding that a complaint which alleges a defendant knew or should have known that the charge was false and that no probable cause existed was sufficient to state a cause of action for malicious prosecution). A defendant may also be held liable where he or she withholds information which could have caused the cessation of criminal proceedings against the plaintiff.
 
 See Harris,
 
 482 So.2d at 1381-82, 1382 n. 9, 1383 n. 16. This is because “there can be no intelligent exercise of the [arresting] officer’s discretion.”
 
 Id.
 
 at 1382 n. 9.
 

 “[T]he question of whether or not the defendant instigated the prosecution upon which” an action is based is a jury issue.
 
 Kilbum,
 
 286 So.2d at 243 (citing
 
 Zippy Mart, Inc. v. Mercer,
 
 244 So.2d 522, 523 (Fla. 1st DCA 1970)). And where there is conflicting evidence, this court “must accept the evidence most favorable to the prevailing party.”
 
 Zippy Mart, Inc.,
 
 244 So.2d at 523.
 

 Here, Flock and Cales gave sworn statements to Deputy Stempowski and participated in follow-up interviews with the arresting detective. Notably, during those interviews, Flock and Cales relayed that Campbell was “bad news,” that she
 
 *604
 
 had been suspected of stealing drugs from another facility, and that she was the only person with access to the drugs during her shift. Although the detective partially relied on Campbell’s behavior during her interview, the detective also made it clear that he relied on the information he received from the Sterling House employees to reach the conclusion that the case against Campbell was “clear.” We recognize that the detective testified that nothing the Sterling House employees told him influenced his investigation. Yet we also recognize that the detective admitted that the information he received about Campbell being “bad news” and being suspected of stealing drugs from another facility remained in the back of his mind during the investigation and tended to “point his compass” in Campbell’s direction. We believe that the jury could have found that the comments about Campbell’s being “bad news” and being suspected of stealing drugs at another facility were the determining factors in Deputy Stempowski’s decision to arrest Campbell.
 

 And as we already noted, Campbell was
 
 not
 
 the only person with access to the drugs on the night in question. Further, the evidence at trial demonstrated that Clare Bridge did not have any missing drugs during the time Campbell worked there, which is inconsistent with Cales’ report that Campbell was suspected of stealing drugs from that facility. And contrary to the report by Flock and Cales that no other drug thefts had occurred prior to Campbell’s assignment, Sterling House had an average of five drug thefts a month. Under these facts, we believe that Alterra knew or should have known that the information which Flock and Cales provided to Deputy Stempowski and the arresting detective was false.
 

 Even if Alterra could not have known the information was false at the time it instigated the proceedings, surely it should have known that the information might have been false once the drug thefts continued after Campbell was fired. Although Flock attempted to report one subsequent drug tampering'theft incident to the detective assigned to Campbell’s case, Flock never reported the incident involving the other employee whose drug screen was positive, despite the fact that that same employee worked shifts just prior to Campbell’s shift on the day in question. Flock also failed to report either incident to Campbell, her attorney, or the State Attorney’s office. Such information might have resulted in the State Attorney’s office dropping the charges at an earlier point in time. Accordingly, there was competent, substantial evidence to support the jury’s finding that Alterra was the legal cause of the criminal proceedings against Campbell.
 

 III. CONCLUSION
 

 Based on these facts, Alterra failed to prove it was entitled to a judgment notwithstanding the verdict, i.e., that “there was no evidence upon which a jury could rely in finding for” Campbell.
 
 Hancock,
 
 941 So.2d at 412. We therefore affirm the final judgment.
 

 NORTHCUTT and KELLY, JJ., Concur.
 

 [1]
 

 . After Campbell’s arrest, the Florida Department of Health initiated its own investigation.
 

 [2]
 

 . During the time Campbell worked at the Clare Bridge facility, there were no reports of missing drugs.
 

 [3]
 

 . Cales filed for bankruptcy prior to trial; though the automatic stay in the bankruptcy proceeding was lifted so that Campbell could proceed with her cause of action, no judgment could be entered against Cales.
 

 [4]
 

 . On appeal, Alterra also raises the issue of whether Campbell sufficiently proved that Al-terra acted with malice. We recognize that malice is not synonymous with "want of probable cause,’’
 
 White v. Miami Home Milk Producers Assn,
 
 143 Fla. 518, 197 So. 125, 126 (1940), but we also recognize that legal malice can be inferred where there is a lack of probable cause,
 
 Alamo Rent-A-Car, Inc.,
 
 632 So.2d at 1357;
 
 Miami-Dade Cnty. v. Asad,
 
 34 Fla. L. Weekly D545 (Fla. 3d DCA 2009). Because we have determined that there was competent, substantial evidence to support the lack of probable cause element, we also find that legal malice could be inferred.
 
 See Asad,
 
 34 Fla. L. Weekly D545.