DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

ANNA K. BASSETT,

Appellant/Cross-Appellee,

v.

PERRY JOSEPH MORINE,

Appellee/Cross-Appellant.

No. 2D2024-2283

_____

May 29, 2026

Appeal pursuant to Fla. R. App. P. 9.130 from the Circuit Court for
Sarasota County; Stephen M. Walker, Judge.

Shea T. Moxon and Thomas J. Seider, Brannock Berman & Seider,
Tampa; Kevin B. Woods, Woods Trial Law, Tampa, for Appellant/Cross-
Appellee.

Warren B. Kwavnick, The Law Office of Warren B. Kwavnick, PLLC,
Pembroke Pines, for Appellee/Cross-Appellant.


ATKINSON, Judge.

Ms. Anna Bassett sued Mr. Perry Morine for negligence. The jury
entered a verdict in favor of Ms. Bassett that included a damages award
of $2,000,000 for future medical expenses. Mr. Morine moved for
remittitur or new trial, and following a hearing, the trial court remitted

the award to $1,274,433.71. Ms. Bassett rejected the remittitur and appealed. We affirm and write only to explain our holding regarding the issue of remittitur.

Ms. Bassett testified that, as a result of the accident, she suffered injuries to her neck that inhibited her range of motion and caused her pain. As part of Ms. Bassett's rehabilitation and pain mitigation protocol, she underwent medial branch blocks ("blocks") and radio frequency ablations ("ablations"). Because blocks and ablations are used in combination to mitigate pain, they are hereafter referred to collectively as the "treatments."[1]

These treatments are the subject of the parties' dispute over Ms. Bassett's future medical expenses award. During trial, there was testimony that Ms. Bassett would need to undergo the treatments anywhere from every six months to once every other year, for the rest of her life. The parties submitted numerous joint exhibits, which included

---

[1] As explained by Dr. Sweeney, one of Ms. Bassett's expert witnesses and treating physicians, blocks are diagnostic procedures that involve injecting medication into the patient to locate the source of pain. Dr. Sweeney testified that once blocks have been used to identify nerves that are causing pain, the ablation procedure is implemented by using a heated needle to burn the problematic nerves, thereby causing them to cease functioning. The burning of nerves decreases pain in the patient, though it is possible for the nerves to regenerate, causing pain to return. At times, the parties refer to the collective treatments as simply "RFAs" or other singular nouns or abbreviations. The record is best read to mean that the parties are referring to *both* radiofrequency ablations and medial branch blocks in doing so. According to Dr. Sweeney's description, the treatments must be administered in tandem—performing only blocks would be to only perform diagnostic treatments without addressing the actual symptoms, while performing only ablations would be to try to address Ms. Bassett's symptoms without diagnosing the particular nerves at issue. Thus, this opinion refers to the treatments collectively, even though the record sometimes refers to only singular procedures.

medical records pertaining to Ms. Bassett's treatment. Those records included a statement from the Ramos Center, indicating that one round of treatments actually performed on Ms. Bassett had cost $15,639.89. During closing argument, Ms. Bassett's counsel relied on the Ramos Center statement to argue that one round of treatments costs "just over $15,000." Ms. Bassett's life care plan indicated that she was expected to live for "another 57.2 years" and that the present value of her life care plan—containing only one round of treatments—was $380,132. The plan only included one round of treatments because the planner was only aware of one round of treatments that were anticipated for an upcoming surgery at the time of creating the plan. The planner indicated that he would defer to Ms. Bassett's treating physicians as to his opinions regarding the frequency and duration of treatments Ms. Bassett would need during her life.

However, another jointly admitted record, from BioSpine Institute, estimated the costs of future medical care and included an "approximate cost" of the treatment as "$35,000 to $45,000" (the "BioSpine estimate" or "cost estimate"). Despite never having argued to the jury that *one round* of treatments would cost this much—and having argued in closing that the per-treatment cost was less than half that amount—Ms. Bassett argued at the post-verdict hearing that the $35,000 to $45,000 figure in the BioSpine estimate justified the damage award for future medical expenses. As the argument goes, the jury's award was supported by the evidence because the jury could have read the BioSpine estimate to represent that the *per-treatment* cost was between $35,000 and $45,000, and at the rate of one treatment per year the present value of the lifetime cost of the treatments would exceed the jury's $2 million award.

3

However, it can be safely assumed that the trial court did not credit that evidence as supportive of the per-treatment cost. When the trial court remitted the future medical expenses award, it multiplied $15,639.89 by 57.2 years, resulting in the sum of $894,601.71 (rounded up to the nearest cent) as the cost of treatments for the rest of Ms. Bassett's life. The trial court added that figure to the life care plan's present value estimate and remitted the future medical expenses award to $1,274,433.71. In its order remitting the future damages award, the trial court expressed its view of "an assumption that Plaintiff will require such treatments more frequently than annually" as "speculative"—and Ms. Bassett never argued in the trial court for anything more than an average frequency of once per year, a point admirably conceded by counsel on appeal. Presumably based on an understanding that the evidence indicated a per-treatment cost of $15,639.89, the trial court concluded that "[i]t appears the amount of damages awarded was based on speculation regarding the frequency of necessary future pain management treatments." On appeal, the parties focus their arguments not on the frequency of the treatments but the per-treatment cost.

## I.

"We review a trial court's ruling on a motion for remittitur under an abuse of discretion standard." *GEICO Indem. Co. v. DeGrandchamp*, 102 So. 3d 685, 686 (Fla. 2d DCA 2012) (citing *Truelove v. Blount*, 954 So. 2d 1284, 1287 (Fla. 2d DCA 2007)); *see also Aills v. Boemi*, 41 So. 3d 1022, 1027 (Fla. 2d DCA 2010) ("The appropriate standard of review of a trial court's order granting a remittitur or an additur is whether there has been a clear showing of abuse of discretion." (citing *Normius v. Eckerd Corp.*, 813 So. 2d 985, 988 (Fla. 2d DCA 2002))). "In any action for the recovery of damages based on personal injury . . . arising out of the

4

operation of a motor vehicle, . . . it shall be the responsibility of the court . . . to review the amount of [money damages awarded] to determine if such amount is clearly excessive . . . ." § 768.043(1), Fla. Stat. (2023). Ms. Bassett argues that the trial court abused its discretion in ordering remittitur because the BioSpine estimate was contained in the record and therefore the jury could have used it to calculate a figure even higher than its $2 million award.

However, the contents and timing of the BioSpine estimate and the report to which it was attached do not support Ms. Bassett's argument. The estimate was created in April of 2023, while the parties were preparing for trial. It was created as a compliment to a report, contained in the same document, prepared by Dr. Ronzo, another one of Ms. Bassett's treating physicians and expert witnesses.

In Dr. Ronzo's report, he recommended that Ms. Bassett undergo the treatments with a frequency of "1x" for a duration of "1–2 years." By contrast, Dr. Ronzo's report indicated that he anticipated Ms. Bassett would need x-rays at a frequency of "2/yr" for a duration of "2–3 years" and MRIs at a frequency of "1/yr" for a duration of "2 years." However, contrary to Ms. Bassett's argument, use of "1x" instead of "1/yr" to describe the frequency of the treatments in the report does not compel the conclusion that later in the document, Dr. Ronzo's estimated cost of $35,000 to $45,000 was for *one* treatment. Rather, Dr. Ronzo's use of "x" was used to describe *annually recurring* costs elsewhere in the same document. The report indicated an anticipated need of office visits at a frequency of "3–4x" for "1-2 years," similar to the description of anticipated treatments. However, later in the same document in the cost estimate, Dr. Ronzo described those visits by stating that Ms. Bassett would need "[a]nnual re-evaluations." Thus, it appears that the

5

correlation between the report and the estimate of costs does not provide a consistent pattern as a reliable guide to conclude that the estimated costs were *per treatment* as opposed to *in total*, if it even provides any guidance on that distinction at all.

However, the cost estimate itself does provide such guidance, and it supports Mr. Morine's interpretation that the "$35,000 to $45,000" indicated a *total* amount and not, as Ms. Bassett contends, a *per-treatment* cost. First, it does not say *per treatment* where it assigns that amount to the treatments—even though on the very same page, the document uses "per visit," "per session," and "per set" to describe the estimated costs of annual reevaluations, physical therapy, and x-rays, respectively. By contrast, the treatments are described in a manner that suggests a global amount: "Radiofrequency ablations- approximate cost of $35,000 to $45,000."

Again, this interpretation is congruent with the other evidence in the record. Ms. Bassett's own argument at trial was that she would incur approximately $15,000 per year in the treatment costs, and the Ramos Center statement indicated that one round of treatments cost $15,639.89. At a rate of one per year, the two-year cost would reach almost $32,000—an amount much closer to the $35,000 to $45,000 figure in the BioSpine estimate than that figure is to the actual past per-treatment cost of $15,639.89. Thus, if the BioSpine estimate and accompanying report are indicative of anything relevant to the lifetime cost of treatments, they are more supportive of Mr. Morine's remittitur argument than they are of Ms. Bassett's justification for the jury award.

The chronology of events further supports an interpretation supporting remittitur. The report and estimate were prepared before trial, and they indicated that Dr. Ronzo anticipated Ms. Bassett would

6

only need treatment for a few years.  It was not until later that Dr. Ronzo testified Ms. Bassett would need the treatments for the rest of her life; accordingly, it does not make sense to interpret the BioSpine estimate as meaning that Dr. Ronzo anticipated Ms. Bassett would incur $35,000 to $45,000 in block and ablations treatments every year for the next fifty-seven years, as Ms. Bassett presently argues.  Later at trial, none of Ms. Bassett's experts testified as to the $35,000 to $45,000 cost range for treatments.  Additionally, Ms. Bassett's economic expert testified to using Ms. Bassett's "past medical records" to estimate the present value of the life care plan, indicating that the expert likely used the Ramos Center statement to calculate the cost of Ms. Bassett's future treatments, as that was the actual cost of care provided to Ms. Bassett in the past.  No argument was made that one round of treatments cost more than $15,639.89 until after trial, coinciding with Ms. Bassett's post hoc effort to justify the jury's award.

Ms. Bassett's argument and its reliance on the BioSpine estimate document are irreconcilable with two important standards applicable to this court's review of the order of remittitur.  First, a plaintiff bears the burden of proving damages in the form of future medical expenses with reasonable certainty.  *See, e.g.*, *Truelove*, 954 So. 2d at 1287 ("In a personal injury action in which the plaintiff seeks damages for future medical expenses, 'only medical expenses which are reasonably certain to be incurred in the future are recoverable.'  There must be 'evidence in the record from which the jury could, with reasonable certainty, determine the amount of medical expense [the plaintiff] would be likely to incur in the future.' " (alteration in original) (citation omitted) (first quoting *Loftin v. Wilson*, 67 So. 2d 185, 188 (Fla. 1953); then quoting *DeAlmeida v. Graham*, 524 So. 2d 666, 668 (Fla. 4th DCA 1987); and

then citing *Walt Disney World Co. v. Blalock*, 640 So. 2d 1156, 1159 (Fla. 5th DCA 1994))); *GEICO Indem. Co.*, 102 So. 3d at 686 (first citing *Loftin*, 67 So. 2d at 188; and then citing *Truelove*, 954 So. 2d at 1287).  When applying the criteria set forth in the remittitur statute, a court cannot do so in isolation but must apply those statutory standards in light of the burden placed on the plaintiff by the standard applicable to the cause of action or type of damages the plaintiff is seeking.  For example, in determining "[w]hether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered," *see* § 768.043(2)(d), it is necessary to determine whether the amount of the damages allocated to future medical expenses were proved to be those "reasonably certain to be incurred in the future," *see Truelove*, 954 So. 2d at 1287 (quoting *Loftin*, 67 So. 2d at 188).  In determining whether the trier of fact "misconceived the merits of the case relating to the amounts of damages recoverable," *see* § 768.043(2)(b), the meritoriousness of the plaintiff's case will depend on whether the evidence allowed the amount of future medical expenses to be determined with "reasonable certainty," *see Truelove*, 954 So. 2d at 1287 (quoting *DeAlmeida*, 524 So. 2d at 668).

On appeal, Ms. Bassett essentially argues that she proved her future medical expenses for the treatments supportive of the jury's verdict by introducing into evidence a single document, describing not a definitive cost, but an estimated range of future costs, about which no witness testified and to which her trial counsel never referred in any argument and which conflicted with other testimonial and documentary evidence in the record.  The theoretical possibility that the jury might have seized upon *that* one document to reach a sum that far exceeded any other relevant evidence, while not totally inconceivable, does not

indicate that the jury award bears a reasonable relation to the amount of future medical expenses that were "reasonably certain to be incurred in the future," *see id.* (quoting *Loftin*, 67 So. 2d at 188), as proved by the evidence in the record or that such an award was "supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons," *see* § 768.043(2)(e). Rather, it raises the likelihood that the "trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation or conjecture." *See* § 768.043(2)(c).

And this brings us to the standard applicable to a trial court's adjudication of the question of remittitur and an appellate court's review of such determination. Trial courts are not tasked with assessing the record to determine whether at least *some* evidence supports the verdict. The standard is not merely competent substantial evidence, such as when adjudicating a motion for judgment notwithstanding the verdict. *See, e.g.*, *Alterra Healthcare Corp. v. Campbell*, 78 So. 3d 595, 601–02 (Fla. 2d DCA 2011) ("A [judgment notwithstanding the verdict] is appropriate only in situations where there is no evidence upon which a jury could rely in finding for the non-movant [sic]. A jury verdict must be sustained if it is supported by competent[,] substantial evidence." (alterations in original) (quoting *Hancock v. Schorr*, 941 So. 2d 409, 412 (Fla. 4th DCA 2006))); *Mulvey v. Stephens*, 250 So. 3d 106, 109 (Fla. 4th DCA 2018) ("A JNOV is appropriate only when there is no evidence upon which the jury could rely in finding for the non-moving party." (citing *Alterra Healthcare Corp.*, 78 So. 3d at 601)). Rather, the legislature has conferred on trial courts an affirmative duty to review the amount of an award of money damages based on personal injury arising out of the operation of a motor vehicle: "[I]t *shall be the responsibility* of the court,

upon proper motion, to review the amount of such award to determine if such amount is clearly excessive or inadequate in light of the facts and circumstances which were presented to the trier of fact," and "[if] the court finds that the amount awarded is clearly excessive or inadequate, it *shall* order a remittitur or additur, as the case may be."  § 768.043(1) (emphasis added).

Trial courts are charged with doing more than merely assessing the record for some competent substantial evidence upon which the jury *might possibly have* relied to support the verdict without regard to how remote that possibility might be; rather, courts must apply the above-described statutory criteria and make a determination as to whether the amount of the award is "clearly excessive or inadequate in light of the facts and circumstances which were presented to the trier of fact."  *See id.*; § 768.043(3) ("It is the intent of the Legislature to vest the trial courts of this state with the discretionary authority to review the amounts of damages awarded by a trier of fact, in light of a standard of excessiveness or inadequacy. . . .  [A] review by the courts in accordance with the standards set forth in this section provides an additional element of soundness and logic to our judicial system and is in the best interests of the citizens of Florida.").

> This assessment . . . involves a sense of touch that can be delivered only by the trial judge that heard and saw the evidence.  Accordingly, we review an order denying a motion for additur under the deferential abuse of discretion standard. We may reverse only where the trial court has made a decision that fails the test of reasonableness.

*Arias v. Porter*, 276 So. 3d 49, 54 (Fla. 2d DCA 2019) (citations omitted) (first citing § 768.043(3), and then citing *Sukraj v. Phoeung*, 241 So. 3d 911, 912 (Fla. 2d DCA 2018), and then citing *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980)); *see also Azoulay v. Condo. Ass'n of*

10

*La Mer Ests.*, 94 So. 3d 686, 688 (Fla. 4th DCA 2012) ("The Legislature has vested trial courts with discretionary authority to review jury verdicts based upon set criteria in order to provide an additional measure of soundness and logic to the judicial system." (citing § 768.74(6), Fla. Stat.)); *Pruitt v. Perez-Gervert*, 41 So. 3d 286, 289 (Fla. 2d DCA 2010) ("Because the award here was greater than what was *reasonably* supported by the evidence, the trial court abused its discretion when it denied the appellants' motion for remittitur." (emphasis added)).

The trial court in this case did not abuse its discretion when it found that the jury's award was clearly excessive and granted remittitur.

Affirmed.

NORTHCUTT and ROTHSTEIN-YOUAKIM, JJ., Concur.

—————————————————

Opinion subject to revision prior to official publication.