941 So.2d 409 (2006)
Betty HANCOCK, as Personal Representative of the Estate of Thomas Hancock, Appellant,
v.
Jay I. SCHORR, M.D., Appellee.
No. 4D05-2634.
District Court of Appeal of Florida, Fourth District.
September 20, 2006.
Rehearing Denied November 29, 2006.
*410 Marjorie Gadarian Graham of Marjorie Gadarian Graham, P.A., Palm Beach Gardens, and F. Shields McManus of Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, P.L., Stuart, for appellant.
Eugene L. Ciotoli and Hector R. Buigas of Bobo, Ciotoli, Bocchino, Newman & Corsini, P.A., North Palm Beach, for appellee.
PER CURIAM.
Betty Hancock, as personal representative of the Estate of Thomas Hancock, brought suit against Jay I. Schorr, M.D., for medical malpractice. Following a jury trial, the jury returned a verdict in favor of the plaintiff. However, the trial court subsequently granted the defendant's motion for directed verdict and the court entered a final judgment in favor of Dr. Schorr. For reasons discussed below, we reverse the final judgment in favor of Dr. Schorr and remand with directions that judgment be entered consistent with the jury's verdict.
Seventy-two-year-old Thomas Hancock was injured in an automobile accident on January 3, 2002 when his automobile was struck on the side door by a semi tractor-trailer rig. He lost consciousness for approximately one to two minutes and his head was bleeding. Following the accident, he was transported by ambulance to the Longwood Regional Medical Center. The emergency room physician, Dr. Swanson, diagnosed him with a rib fracture, a thoracic sprain/strain, osteolytic lesion, and closed head injury with concussion and loss of consciousness. That same day, Dr. Swanson called Dr. Schorr, Hancock's primary care physician. They decided to have Mr. Hancock follow up with Dr. Schorr within twenty-four hours, either in office or via a phone call. Dr. Swanson and Dr. Schorr agreed that Mr. Hancock *411 should follow up on an outpatient basis and that admission to the hospital was not necessary at that time, and as a result, Mr. Hancock was sent home.
Mrs. Hancock testified that when her husband was released from the hospital, he was in so much pain that he was hardly able to move or get into the vehicle himself. The following day, January 4, 2002, Mr. Hancock complained of pain and soreness and was too sore to get out of bed and walk around and had to resort to use of the urinal. Mrs. Hancock gave him his prescribed pain medication and muscle relaxant for his complaints. Around 9:00 a.m., Mrs. Hancock called Dr. Schorr's office and spoke with the receptionist. She gave the receptionist her name, her husband's name, and explained that Mr. Hancock had been in an automobile accident the day before, was in the emergency room but was sent home, and that she had been advised to call Dr. Schorr. The receptionist advised her, "I will get back to you." Mrs. Hancock received a call back from the receptionist who informed her that Mr. Hancock was scheduled for an MRI the following week; however, she did not advise Mr. Hancock to come in and see Dr. Schorr, and there was no discussion of a follow-up appointment. Dr. Schorr did not call Mrs. Hancock on January 4, 2002. For the rest of that day, Mr. Hancock continued to complain of soreness and slept a lot, although he was able to eat breakfast, lunch, and dinner and take his medication. The following day, January 5, Mrs. Hancock did not see any improvement. Finally, on January 6, Mrs. Hancock persuaded him to sit up in his chair by the bed and eat lunch, but doing so exhausted him. Around 5:00 p.m., when she came into the bedroom, she saw him at the foot of his bed on his back. She felt a thready pulse and immediately dialed 911. When the paramedics arrived, Mr. Hancock was dead at the scene.
Dr. Mittleman, the doctor who performed the autopsy and one of plaintiff's three experts at trial, concluded that the trauma of the accident and Hancock's high blood pressure put stress on his heart, resulting in an arrhythmia that caused his death. In addition to the testimony of Dr. Mittleman, the plaintiff presented the testimony of two expert witnesses, Dr. Richardson, a family physician, and Dr. Sellers, a cardiologist who specializes in electrophysiology, a subspecialty of cardiology that entails treating heart rhythm problems. Dr. Richardson's opinion was that Dr. Schorr deviated from the applicable standard of care because of his failure to order tests or to direct admission to the hospital. Moreover, in Dr. Richardson's opinion, it was more likely than not that Mr. Hancock would have survived with appropriate treatment.
Dr. Sellers also testified that had Mr. Hancock been treated appropriately in a medical center within the time frame of January 3 to January 4, he would have avoided death. Dr. Sellers estimated that Mr. Hancock would have had at least a 60% chance of surviving if he had been treated in a hospital. Furthermore, if Mr. Hancock had been admitted to the hospital on January 3, 2002, more likely than not, the sudden cardiac arrhythmia would not have occurred. Dr. Sellers based his opinion on the fact that prior to the accident, despite underlying medical problems, including diabetes, hypertension, and some heart problems, Mr. Hancock was healthy and able to function. Dr. Sellers explained that if Mr. Hancock had been admitted to the hospital, all of the problems he had, "if it's kidney problems, if it's electrolyte problems, hypoxia, or any of those kinds of things," would have been discovered and taken care of. For example, if his potassium level was too high, they could have administered Kayexalate, and if it was too *412 low, they could have infused him with potassium to bring it up. If his oxygen level was too low, which could cause an abnormal heart rhythm, they could have administered oxygen. Although he had no lab results concerning Mr. Hancock's potassium level following the accident, Dr. Sellers concluded that "it is more than likely that it went up or went down to cause his abnormal heart rhythm." Dr. Sellers further testified that Hancock's fractured ribs and subcutaneous emphysema required admission to the hospital and without such treatment would have contributed to his death.
Following the trial, the jury returned a verdict finding negligence on the part of Dr. Schorr that was a legal cause of the death of Mr. Hancock. The trial court subsequently entered a final judgment in favor of the plaintiff for the sum of $2,181,954.00. Dr. Schorr filed a timely motion for judgment in accordance with the motion for directed verdict. Following a hearing, the trial court entered an order granting the motion for judgment in accordance with the motion for directed verdict and entered a final judgment in favor of Dr. Schorr. The court determined that there was sufficient evidence for a jury to determine that Dr. Schorr breached the applicable standard of care by not admitting or at least talking to Mr. Hancock, a seventy-two-year-old man with a history of heart problems who had been in a serious automobile accident, lost consciousness, and suffered at least one fractured rib. However, the court concluded that any finding of causation could only be based on "at least an inference on an inference on an inference" and therefore the plaintiff failed to establish that the defendant's breach of the standard of care proximately caused the damages claimed.
Mrs. Hancock appeals, arguing that the trial court erred in granting Dr. Schorr's motion for judgment in accordance with the motion for directed verdict because there was sufficient expert testimony for the jury to determine that Dr. Schorr's failure to admit her husband to the hospital on January 3, 2002 and not seeing him on January 4, 2002 was the legal cause of his death. We agree.
In reviewing an order granting a judgment notwithstanding the verdict ("JNOV"), an appellate court must view the evidence in a light most favorable to the non-moving party, resolve all conflicts in the evidence in favor of the non-movant, and construe every reasonable conclusion which may be drawn from the evidence in favor of the non-movant. See McQueen v. Jersani, 909 So.2d 491, 492-93 (Fla. 5th DCA 2005). A JNOV is appropriate only in situations where there is no evidence upon which a jury could rely in finding for the non-movant. See id. A jury verdict must be sustained if it is supported by competent substantial evidence. See Richey v. Modular Designs, Inc., 879 So.2d 665, 667 (Fla. 1st DCA 2004). The standard of review on appeal of a trial court's ruling on a motion for directed verdict is de novo. See Contreras v. U.S. Sec. Ins. Co., 927 So.2d 16, 20 (Fla. 4th DCA 2006).
To prevail in a medical malpractice case, a plaintiff must establish the following: the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed. See Gooding v. Univ. Hosp. Bldg. Inc., 445 So.2d 1015, 1018 (Fla.1984). With respect to causation, the Court held that in negligence actions Florida courts follow the "more likely than not" standard of causation and require proof that the negligence probably caused the plaintiff's injury. See id. The Court explained:
On the issue of the fact of causation, as on other issues essential to his cause of *413 action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.
Id.
After reviewing the record in a light most favorable to the plaintiff, it is clear that this case was properly submitted to the jury and that the jury's verdict is supported by competent substantial evidence. There was evidence, primarily the testimony of Dr. Sellers, upon which the jury could rely in finding that Dr. Schorr was negligent and that his negligence was the proximate cause of Mr. Hancock's death. Dr. Sellers's testimony established that Mr. Hancock's death more likely than not resulted from Dr. Schorr's failure to admit him to the hospital, meeting the standard set forth in Gooding. Dr. Sellers estimated that Mr. Hancock would have had at least a 60% chance of surviving if he had been treated in a hospital. Moreover, if Mr. Hancock had been admitted to the hospital on January 3, 2002, more likely than not, the sudden cardiac arrhythmia would not have occurred, and it is undisputed that Mr. Hancock's death resulted from cardiac arrhythmia.
Furthermore, as Dr. Sellers testified, if Mr. Hancock had been admitted to the hospital, tests would have been conducted, and problems could have been taken care of, whether a potassium deficiency or a low oxygen level. Although, as Dr. Schorr argues, Dr. Sellers did not base his opinions on lab results concerning Mr. Hancock's potassium level following the accident, the lack of any testing is a result of the failure to admit Mr. Hancock to the hospital. Such testing would have been conducted and readily available for diagnosing Mr. Hancock's medical problems and determining the appropriate treatment. Finally, in addition to Dr. Sellers's testimony, the plaintiff also presented the testimony of a second expert, Dr. Richardson, who agreed that it was more likely than not that Mr. Hancock would have survived with appropriate treatment.
Therefore, in light of the expert opinions, we conclude that the plaintiff made a prima facie case on the issue of causation, which issue was properly submitted to the jury. For the foregoing reasons, the final judgment for Dr. Schorr entered on his motion for judgment notwithstanding the verdict is reversed, and the jury verdict in favor of the plaintiff is reinstated. The trial court is directed to enter a judgment in favor of the plaintiff based on the jury verdict.
Reversed.
GUNTHER and HAZOURI, JJ., concur.
MAY, J., dissents with opinion.
MAY, J., dissenting.
I respectfully dissent. Despite the tragedy that occurred, I believe the law supports the trial court's order. I would affirm.
As the trial court stated in its order: "The rule is that expert opinion may support a jury verdict, so long as it is grounded in fact, even though it involves a conclusion as to causation, but a verdict should not be based upon speculative and conjectural expert testimony with no basis in evidentiary fact." Unfortunately for the plaintiff, there was insufficient evidence *414 upon which the plaintiff's expert could rely to render a competent opinion on causation in this case.
Our supreme court established the burden of proof in a medical malpractice case in Gooding v. University Hospital Building, Inc., 445 So.2d 1015 (Fla.1984). "To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." Id. at 1018. More specifically, when the issue is the loss of the chance for survival, "[t]he plaintiff must show that the injury more likely than not resulted from the defendant's negligence in order to establish a jury question on proximate cause. In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome." Id. at 1020.
As articulated by the trial court:
The evidentiary facts in this case are that Mr. Hancock was not admitted. Mr. Hancock should have been admitted. Mr. Hancock died. Dr. Sellers' opinions/assumptions are that had he been admitted he would have undergone a battery of tests, that specialists would have examined or consulted on the case, that the tests would have revealed that Mr. Hancock's potassium levels were either too high or too low, or that other problems relating to his kidneys, stress or complications from fractures would have been found and treated; that he would have been kept in the hospital for a sufficient length of time to determine this and that with this, the arrhythmia would have been prevented as, had it occurred, more likely than not he would have died.
The fatal flaw in the plaintiff's proof on causation was that it was based on speculation and a stacking of inferences for there was no factual basis to support the expert's hypothesis. See Young-Chin v. City of Homestead, 597 So.2d 879, 882 (Fla. 3d DCA 1992) (quoting Nat Harrison Assocs., Inc. v. Byrd, 256 So.2d 50, 53 (Fla. 4th DCA 1971)) ("An opinion derived from facts not in evidence, permitted the expert to express `unstated and perhaps unwarranted factual assumptions concerning the event. . . .'"). As the plaintiff's expert, Dr. Sellers, testified:
Q. For you to say that that is evidence that his potassium was elevated is pure speculation on your part?
A. Yes.
The majority relies upon the expert's conclusions to reach its result. Unfortunately, those conclusions were not based on facts; they were based on hypothetical explanations with no foundational basis. The trial court acknowledged that the plaintiff had provided sufficient proof of a breach of the standard of care, but when the testimony was reviewed, the proof fell short on the issue of causation. I would affirm the order granting the defendant's motion for judgment in accordance with the motion for directed verdict.