970 So.2d 354 (2007)
WESTSHIP WORLD YACHTS, LLC, Appellant,
v.
REEL DEAL YACHTS, INC., Appellee.
No. 3D05-735.
District Court of Appeal of Florida, Third District.
September 26, 2007.
Rehearing Denied November 21, 2007.
*355 Fowler White Boggs Banker and Ceci Culpepper Berman and D. Finn Pressly, Tampa, for appellant.
Zarco Einhorn Salkowski & Brito and Robert Zarco and Michelle M. Odio, Miami, for appellee.
Before SHEPHERD, J., and SCHWARTZ and FLETCHER, Senior Judges.
PER CURIAM.
The judgment entered below on a jury verdict in favor of the plaintiff-appellee-yacht broker Reel Deal Yachts, Inc., for a commission on the sale of a vessel built and owned by the defendant-appellant Westship World Yachts, LLC, is reversed with directions to enter judgment for the appellant. This holding is based on the conclusion that, viewing the record in the required light most favorable to the verdict winner,[1] there is no evidence that the efforts of the appellee or anyone acting on its behalf were a procuring cause of the sale, which would clearly have taken place as a result of direct contact between the principals regardless of any of the conduct upon which Reel Deal relies. See Siegel v. Landquest, Inc., 761 So.2d 415 (Fla. 5th DCA 2000), review denied, 780 So.2d 914 (Fla.2001); Earnest & Stewart, Inc. v. Codina, 732 So.2d 364, 365-66 (Fla. 3d DCA 1999); Stadler Commercial Real Estate Servs., Inc. v. Indus. Waste Servs., Inc., 519 So.2d 739 (Fla. 3d DCA 1988); Kotler v. Morris Kroop, Inc., 354 So.2d 110 (Fla. 3d DCA 1978), cert. denied, 359 So.2d 1217 (Fla.1978); Dixson v. Kattel, 311 So.2d 827 (Fla. 3d DCA 1975).
Reversed and remanded.
SCHWARTZ and FLETCHER, Senior Judges, concur.
SHEPHERD, J., dissenting.
The question presented to the jury was whether or not a local yacht broker, Reel Deal Yachts, Inc., was the procuring cause of the sale of a high-end luxury yacht manufactured by Westship World Yachts, LLC, to Searay Holdings, Inc. Acknowledging the high standard the appellants were required to meet, Tenny v. Allen, 858 So.2d 1192, 1195 (Fla. 5th DCA 2003) ("A motion for directed verdict should be granted only where no view of the evidence, or inferences made therefrom, could support a verdict for the non-moving party."), *356 the majority concludes there was no evidence from which the jury could have reached a verdict for Reel Deal in this case. I respectfully disagree. A brief narrative of the evidence presented at the trial is necessary to explain my conclusion.[2]

THE TRIAL
This case arises out of the August 2002 purchase by Ramon Baez of a 103" Westship custom yacht in the name of his company, Searay. According to the record of the trial, Reel Deal broker and owner, Marcos Morjain, conceived the idea of selling the yacht to Baez just six months earlier, in February 2002, as he was completing the sale of a sister ship to Juan Bellaparte. Bellaparte is Baez's friend.
Morjain initiated the execution of his idea by contacting longtime Baez attaché, Luis Matos. Although the relationship between Baez and Matos spans many years, their precise relationship is murky, and was a central focus of the trial. Morjain met Baez and Matos ten years earlier when the two of them walked into Reel Deal's Dinner Key yacht brokerage office. It was a profitable encounter for Morjain. Baez decided to purchase a yacht through Reel Deal. After deciding on the purchase, Baez left for his home country, the Dominican Republic, leaving Matos behind to consummate the sale and delivery of the yacht to him there. Morjain testified he understood Matos to be Baez's agent for the purchase and delivery of that yacht. From that time to this, Matos twice called Morjain to try to sell two other yachts owned by Baez. Morjain was unsuccessful in those endeavors.
In response to Morjain's inquiry, Matos told Morjain that Morjain could meet both him and Baez in Fort Lauderdale on March 28, 2002, at lunchtime, to introduce the yacht to Baez. In anticipation of that meeting, Morjain obtained an information packet on the yacht and registered himself with Westship as the broker for "Ricardo Baez."[3]
On March 28, Morjain showed up in Fort Lauderdale and met Baez, who was accompanied by a female friend, Matos, and Kevin McCarthy, a rival broker who worked for Allied Richard Bertram Marine Group. McCarthy had been Baez's primary  but not exclusivebroker for a number of prior yacht purchases. According to Morjain's own testimony, Morjain approached Baez and attempted to hand him the packet regarding the available yacht. Baez directed Morjain to give the packet to Matos instead. As Morjain explained:
I offered to give the package to Mr. Baez. I told him, [h]ere's the information on the boat he wanted. He told me give it to Mr. Matos, that he'll take care of it, and then we'll get back to you.
Morjain further testified that after this encounter, he made several phone calls to Matos "trying to make the sales pitch." He also sought and received permission from his former client, Bellaparte, for Baez to tour the sister ship at a May 28-29 fishing tournament in the Dominican Republic, where the Bellaparte yacht would be fishing. Morjain told Matos this news and flew to the Dominican Republic with the intent of showing the sister ship to Baez and pursuing the sale. Baez toured the ship before Morjain arrived.
*357 Although neither Baez nor Matos testified at the trial, it was apparent from the testimony that one of Baez's chief concerns about purchasing a 103" Westship was its "ability to fish." As it turned out, Baez spent a considerable amount of time during the tournament circling the Bellaparte yacht on his own fishing yacht, observing the Bellaparte yacht fish. The Bellaparte yacht performed exceedingly well, landing five or six Marlin. According to Morjain, "it was the talk of the tournament."
At a cocktail party on one of those evenings, Morjain pursued Baez and engaged him in conversation about his interest in the vessel. Baez replied he was "very excited [by the sister ship's performance as a fishing vessel] and, you know, to get  he's going to get with Mr. Matos and get back with me." Morjain again contacted Westship and registered himself as a broker for the sale of the yacht, this time correctly representing his potential client as "Ramon Baez."
The next day, Morjain received a phone call from Matos, stating:
Mr. Baez wanted to know how he can change the engines on this boat, how much it would cost, how long it would take. And if they can takemodify the crow's nest, the part on the top of the boat, and put a tower on the boat. He wanted to know how long it would take to do that.
Morjain called Westship in an effort to make the changes.
Meanwhile, Baez contacted McCarthy  arguably for the first time  regarding the sale of the vessel and, on June 6, 2002, just days after the remarkable performance of the Bellaparte yacht at the Dominican fishing tournament, registered himself with Westship as the broker for both Baez and Searay for the proposed purchase.[4] Events then moved rapidly. By June 10, 2002, McCarthy and Jorge Castro, designated by then as Baez's owner representative, examined the vessel at Westship's Tampa manufacturing yard and reported back to Baez. Within the week, Baez, in the company of McCarthy, Castro, and Baez's wife, viewed the yacht. By June 14, Baez put down $2,000,000 toward the $7,200,000 purchase price of the yacht, and executed a non-binding letter of intent to purchase the yacht in the name of Searay. In that document, Baez represented "[that] Kevin McCarthy of The Allied Marine Group [w]as his broker" and that there were "no other brokers [i]n connection with this transaction." Baez also agreed to indemnify Westship in the event of a dispute over the brokerage commission. On this basis, the deal closed, Westship paid the bulk of the commission to McCarthy, and by August 2002sixty days after McCarthy became involved  the Bellaparte sister ship was docked in the Dominican Republic for Baez's sport.

ANALYSIS
Charged with this evidence, the jury had to decide whether Reel Deal was the "procuring cause" of the sale. The jury said, "Yes." The majority says, "No." The majority finds that "the sale [of the yacht] . . . would clearly have taken place as a result of direct contact between the principals"  presumably Baez and McCarthy  "regardless of the conduct upon which Reel Deal relies." That is a deducible *358 view of the evidence presented. Yet, the majority decision ignores the quite deducible alternative that after the successful showing by the Bellaparte yacht at the fishing tournament, Baez elected to call his friend and lunch buddy, Kevin McCarthy, to consummate the purchase. In fact, there was evidence from which the jury logically could have concluded that, faced with competing brokerage registrations and the need or desire to sell a multi-million dollar product, Westship decided to sell to Baez in the face of a potential commission dispute in the comfort of Baez's brokerage representation and indemnity. I do not vouch for this rendering, but simply offer it secure in the knowledge that our role as a reviewing court is to evaluate the testimony and inferences that may reasonably be drawn therefrom "in a light most favorable to the non-moving party." Hancock v. Schorr, 941 So.2d 409, 412 (Fla. 4th DCA 2006). I find some evidence on which the jury could have reached its decision. For me, this is the end of the inquiry. See Tenny, 858 So.2d at 1195.
On this point, it is important to recognize that the commission seeker is not required to have actually consummated the sale. Rather, the seeker is required only to have been "involved in the continuing negotiations," which ultimately result in the sale. See Siegel v. Landquest, Inc., 761 So.2d 415, 417 (Fla. 5th DCA 2000) (holding that for a broker to be entitled to a commission as the "procuring cause" of a sale under Florida law, the broker must prove not only that he brought the parties together, but also that he was "involved in the continuing negotiations between the seller and the buyer [unless] the seller and buyer intentionally exclude the broker from the negotiations."). This distinction is important, especially in this case, where there exists a plausible view of the evidence that when the enthusiasm to purchase ultimately engulfed Baez during the May 28-29 fishing tournament in the Dominican Republic, Baez elected to jettison Morjainthe person with whom he worked for months through Matosin favor of his regular broker, Kevin McCarthy.
This view of the evidence rests, of course, on the resolution favorable to Reel Deal of the subsidiary issue that there exists sufficient evidence in the record to support a jury decision that Luis Matos was the apparent agent of Ramon Baez for the purchase of the yacht. This point was hotly contested at trial. Westship forcefully argued to the jury, and argues here, that Matos was unauthorized to act on Baez's behalf. However, even if an agent's act is unauthorized, the principal still can be held liable if the principal has imbued the agent with apparent authority to do the act, and that authority was reasonably relied upon by a third-party. Benson v. Seestrom, 409 So.2d 172, 173 (Fla. 2d DCA 1982) ("A principal is responsible for the acts of his agent. Even where an agent's act is unauthorized, the principal is liable if the agent had the apparent authority to do the act and that apparent authority was reasonably relied upon by the third party dealing with the agent.").
In this case, there is sufficient evidence by which the jury could reach the conclusion that Baez had imbued Matos with apparent authority to represent him in the purchase. Amongst the evidence adduced at trial was evidence that Baez previously had deputized Matos to consummate a yacht purchase through Morjain. While the facts of a transaction a decade prior ordinarily would lend little support to a Reel Deal commission claim ten years later, see Restatement (Second) of Agency, § 125 cmt. B (1958), Reel Deal's apparent agency argument in this case is fortified by the undisputed evidence that Matos called Morjain twice more during the intervening *359 years in attempts to procure Morjain's services in selling Baez-owned yachts. At no time during or after these conversations did Baez ever advise Morjain that Matos was not authorized to act on behalf of Baez. In addition, there is evidence from which the jury could conclude that Baez, as principal, took action relating to the potential purchase in this case in response to actions orchestrated by Matos, including showing up for a tour of the Bellaparte sister ship within a matter of days after Morjain arranged with Bellaparte for the tour. Finally, of course, there were direct personal encounters between Baez and Morjain.
While I might well have argued for a different view of the evidence had I sat on the jury, in the limited role assigned to me, I cannot conclude here that there was "no evidence" to support the verdict.
I would affirm the jury verdict in this case.
NOTES
[1] For this purpose, we assume arguendo that the items of evidence objected to by appellant were properly admitted. But see Standley v. White, 326 So.2d 68, 69 (Fla. 1st DCA 1976)("Agency may not be proved by a declaration of the putative agent in the absence of the principal."); Aerovias Panama, S.A. v. Air Carrier Engine Serv., Inc., 195 So.2d 230, 231 (Fla. 3d DCA 1967)(same); but cf. Blunt v. Tripp Scott, P.A., 962 So.2d 987, 989 (Fla. 4th DCA 2007) ("reliance of a third party on the apparent authority of a principal's agent must . . . rest in the actions of or appearances created by the principal, see Rushing v. Garrett, 375 So.2d 903, 906 (Fla. 1st DCA 1979), and `not by agents who often ingeniously create an appearance of authority by their own acts[]' Taco Bell of California v. Zappone, 324 So.2d 121, 124 (Fla. 2d DCA 1975)[]" (quoting Lensa Corp. v. Poinciana Gardens Ass'n, 765 So.2d 296, 298 (Fla. 4th DCA 2000))); Spence, Payne, Masington & Grossman, P.A. v. Philip M. Gerson, P.A., 483 So.2d 775 (Fla. 3d DCA 1986)(same), review denied, 492 So.2d 1334 (Fla.1986).
[2] As done by the majority, see supra p. 355, n. 1, I assume, arguendo, that certain disputed items of evidence were properly admitted.
[3] Morjain testified the mistaken first name was a secretarial error he missed when he signed the registration.
[4] McCarthy's registration post-dated both Morjain's first and second registrations. Although it is customary in the industry for yacht brokers to register themselves with the manufacturer to protect their commissions, it is not customary to obtain a purchaser's signature to definitively identify the broker. In this case, Westship advised Morjain and McCarthy of the dueling registrations within days of their receipt by Westship, and asked them to resolve any issues among themselves. They obviously did not.