WARNER, J.
Utopia Provider Systems, Inc., appeals a final judgment for breach of a royalty-bearing license agreement. It contends that the trial court erred in granting a judgment notwithstanding the verdict to appellee, Pro-Med Clinical Systems, LLC, based upon the court’s interpretation of a pretrial stipulation. It also alleges that the court erred in granting a motion in limine reducing Utopia’s damages based upon the court’s interpretation of provisions of the licensing agreement. We agree that the trial court erred in both respects. The pretrial stipulation was ambiguous, and the court’s interpretation not only decided the issue contrary to the jury’s determination, but also was inconsistent with the facts and circumstances of the case. Additionally, construing all of the contractual provisions together, the contract provided for post-expiration royalties for Utopia, and the court therefore erred by granting the motion in limine. We reverse the final judgment.
In 2001, Dr. Michael McHale and Joshua Plummer developed the ED Maximus System, a paper-based system of about sixty templates used by emergency room doctors to document patient encounters.[1] They formed Utopia and assigned it their rights in the system to own and manage, which included any electronic medical record based on the product. Utopia and Pro-Med entered into a license agreement which gave Pro-Med the right to sell, market and use ED Maximus (referred to as “Pro-Med Maximus”). The agreement acknowledged that the licensed materials were the trade secret property of Utopia. It allowed Pro-Med to incorporate the Pro-Med Maximus into any paper or electronic revisions of the system. Pro-Med *559 agreed to be the exclusive marketing agent and exclusive sales representative of Pro-Med Maximus and agreed to pay Utopia a monthly royalty of 50% of revenue amounts collected by Pro-Med from its end-users of any form of the ProTMed Maximus module. It also agreed to continue to pay a royalty to the extent that end-users continued using the system after expiration or termination of the license agreement. Pro-Med was required to provide Utopia a monthly royalty report and to maintain proper books- and records to allow Utopia, to verify Pro-Med’s compliance with the amount of royalties due.
After instituting the agreement, hospitals trended towards making their records electronic. McHale and Plummer discussed with Pro-Med the creation of an electronic form of Pro-Med Maximus. Using the content of the licensed material, and with the assistance of McHale and Plummer, Pro-Med produced a version of an electronic physician documentation (“EPD”) computer program, derived from the Maximus templates and under the license agreement. As a result, McHale and Plummer expected to continue to receive royalties for the electronic system from Pro-Med.
Pro-Med installed the EPD program in test hospitals. It also supplied Utopia a tablet PC with -the electronic version on it, and Utopia provided feedback on the program. Pro-Med then began marketing it to existing clients, but never told Utopia that the product was past the' testing phase. In September 2003, thirteen hospitals which had been using the paper system switched to the [1] electronic system. According to Utopia, beginning in 2003, Pro-Med did not pay Utopia any royalties on collected revenues that Pro-Med received from sales of the electronic system. Instead, it told Utopia that the product was not getting users.
The parties commenced negotiátions on a new licensing agreement, as the old agreement was to expire in October 2006. Several proposals were suggested between the parties, including a reduction of royalties to Utopia in a renewed agreement. However, no agreement came to fruition. In February 2006, without Utopia’s agreement os' consideration, Pro-Med reduced the percentage of royalties paid to Utopia on the paper system, the Pro-Med Maxi-mus, from 50% to 30%. It wasn’t until the late fall of 2006 that Utopia learned that the EPD program was doing better than believed, as Pro-Med had told it that the product had p lack of success and wasn’t being accepted into the market.
On October 1, 2006, the license agreement terminated. Utopia and Pro-Med did not enter into a renewed license agreement. After the license agreement expired, Pro-Med again decreased the percentage it was paying, down to 20%, as it continued to self and distribute the template system and the electronic system based on it. Utopia received royalty checks from October 2006 through 2007 for the Pro-Med Maximus module at the rate of only 20%.
Utopia sued Pro-Med for breach of the license agreement for non-payment of royalties. It sought 50% of the revenues of Pro-Med’s sales of the paper medical record templates between February 2006 and June 2007 and royalties for the EPD. Pro-Med filed a counterclaim for breach of contract for failing to deliver the paper templates in an MS Word format and failing to certify that they were Health Care Financing Administration compliant. It alleged that McHale fraudulently induced Pro-Med to enter into the licensing agreement by making misrepresentations that there was a complete set of templates to deliver and claimed a violation of Florida’s Unfair and Deceptive Trade Practices Act. *560 Lastly, Pro-Med alleged that McHale had organized Utopia as an alter ego for himself and used it to shield himself from individual liability.
Prior to trial, the parties filed a Joint Pretrial Stipulation which gave a statement of the facts in part as follows:
Utopia claims that' Pro-Med breached the License Agreement by not paying royalties it owed to Utopia based on sales of Pro-Med Maximus. Utopia claims that Pro-Med was required to pay 50% of the revenue collected by Pro-Med on sales of Pro-Med Maximus rather than the 30% it paid to Utopia during the five-year term of the License Agreement and the 20% it paid to Utopia after the expiration of the License Agreement during the period of October 2006 through June 2007.
Pro-Med further defends against Utopia’s claim that the License Agreement required Pro-Med to make royalty payments in the amount of 50% of the collected revenues, rather than 30% of the collected revenues, from February 2006 through September 2006 based on the claim that the Parties amended the License Agreement in 2006 to reduce the obligation to pay royalties to 30% of the collected revenues.
As part of the “Mist of any stipulated facts requiring no proof at trial,” the parties stated:
24. In February 2006, Pro-Med reduced the amount of percentage of collected revenue that Utopia received from fifty percent (50%) to thirty.percent (30%) for Pro-Med Maximus. This reduction in royalty percentage to be received by Utopia was agreed upon by Utopia as part of the negotiations between the parties to enter into a renewal license agreement.
25. In October 2006, Pro-Med reduced the amount of percentage of collected revenue that Utopia received for Pro-Med Maximus from thirty percent (30%) to twenty (20%) percent.
' The stipulation stated in the “disputed issues of law and fact to be tried”:
1. Whether Pro-Med breached a contractual obligation to make royalty payments at a certain percentage of collected revenue to Utopia based on Pro-Med’s sales of the paper-based Pro-Med Maximus product?
2, Whether Pro-Med breached a contractual obligation to make royalty payments to Utopia based on Pro-Med’s sales of the electronic EPD product?
The jury returned a verdict for Utopia on its claims against Pro-Med and also for Utopia on the counterclaims. The verdict form asked the jury to determine the percentage of collected revenues that Pro-Med was obligated to pay Utopia for two set time frames.. The jury found that Pro-Med was obligated to pay 50% for each time frame.
Pro-Med filed a motion ■ and amended motion for judgment notwithstanding the verdict in which it argued, among other issues, that the court should reduce the percentage the jury found from 50% to 30% because the parties stipulated prior to trial that they amended the royalty provision to reduce the amount of collected revenue. Utopia also moved for a new trial on damages, contending that in granting a pretrial motion in limine, the court had improperly precluded it from claiming royalties on revenues collected from new users of the EPD program after October 1, 2006. The court ultimately agreed with Pro-Med and granted its motion in. part, reducing the amount of the royalties from 50% to 30% of the revenues, in accordance with what it found to be the pretrial stipulation of the parties. It denied Utopia’s *561 motion. It entered a judgment for damages for Utopia in an amount considerably less than that to which Utopia would have been entitled if the jury’s 50% royalty rate had been applied and had the revenue from the new end users been included. From that judgment, Utopia appeals.

Motion for Judgment Notwithstanding the Verdict (“JNOV”)

We first consider the trial court’s grant of the motion for JNOV. In reviewing an order granting a JNOV, “an appellate court must view the evidence in a light most favorable to the non-moving party, resolve all' conflicts in the evidence in favor of the non-movant,” here, Utopia, “and construe every reasonable conclusion which may be drawn from the evidence in favor of the non-movant.” Hancock v. Schorr, 941 So.2d 409, 412 (Fla. 4th DCA 2006). “A JNOV is appropriate only in situations where there is no evidence upon which a jury could rely in finding for the non-movant.” Id. A jury verdict must be sustained on a motion for JNOV if the verdict is supported by competent substantial evidence. Id. “The standard of review on appeal of a trial court’s ruling on a motion' for directed verdict is de novo.” Id.
After the jury returned a verdict finding that Utopia was entitled to royalties of 50% of collected revenues, the trial court reduced that finding to 30% solely on the basis of a pretrial stipulation that even the court acknowledged was susceptible of twb different meanings. ' It had denied this same argument during trial when Pro-Med moved for a directed verdict.
When construing stipulations, a court should attempt to interpret it in line with the apparent intent of the parties. As explained in Travelers Insurance Co. v. VES Service Co., 576 So.2d 1349, 1350 (Fla. 1st DCA 1991):
A stipulation ... must be carefully examined to determine whether the language used actually discloses a clear, positive, and definite stipulated fact. The statement should not be vague or ambiguous. Nevertheless, it should receive a construction in harmony.with the apparent intention of the parties. It is not to be construed technically, but rather in accordance with its spirit, in furtherance of justice, in the light of the circumstances surrounding the parties, and in view of the result that they were attempting to accomplish.
(Emphasis added). In Travelers, a woman was injured in a Burger King when a surveillance camera, maintained by VES, fell on her. Id. at 1349. Burger King entered into a stipulation in the woman’s suit for' damages in which it admitted that the camera was in its exclusive possession, that it was negligent in failing to attach the camera to the ceiling, and that its negligence was the cause of the plaintiffs damages.’ Id. After a jury award of damages to the woman, Burger King’s insurer, Travelers, filed suit against VES, the camera equipment servicer, for indemnification and contribution on grounds that the damages were caused by VES’s failure to maintain the equipment. Id. at 1350. VES asserted that the stipulation precluded Burger King from indemnification or contribution, because Burger .King admitted it was the sole cause of the injuries. Id. The trial court ruled that the stipulation was an admission of liability by Burger King and granted judgment for VES. Id. .
The appellate court reversed, concluding that the stipulation contained ambiguous language and did not amount to an admission of liability but only admitted the fact that the camera was in Burger King’s exclusive .possession and control. Id. at 1350-51. It looked to the surrounding facts to conclude that Burger King did not *562 intend to eliminate its claim against VES. Id, The court noted that at the time Burger King had entered into the stipulation, it had also sent VES a demand for contribution, thus negating an inference that it intended to admit sole responsibility for negligence to the exclusion of VES. Id. at 1351. Thus, it considered the surrounding circumstances as well as the language of the stipulation. Id.
In this case, the parties made the following stipulations:
In February 2006, Pro-Med reduced the amount of percentage of collected revenue that Utopia received from fifty percent (50%) to thirty percent (30%) for Pro-Med Maximus. The reduction in royalty percentage to be received by Utopia was agreed upon by Utopia as part of the negotiations between the parties to enter into a renewal license agreement.
In October 2006, Pro-Med reduced the amount of percentage of collected revenue that Utopia received for Pro-Med Maximus from thirty percent (30%) to twenty (20%) percent.
(Emphasis added). These statements do not amount to an acknowledgment that Utopia agreed to a reduction in rate if no renewal license was reached, as occurred. They must be construed in accordance with the entire joint pretrial stipulation in which Utopia claimed that Pro-Med had breached the contract by paying it only 30% of the revenues instead of 50%. If the stipulation were construed in accordance with Pro-Med’s interpretation, there would be no lawsuit as to these royalties at all. At the very least, the stipulation is ambiguous. Consideration of the full pretrial statement as well as the testimony presented to the jury, however, shows that there was no agreement to reduce the royalty unless a new agreement was reached.
Utopia’s counsel argued, without objection, throughout the trial that Utopia had agreed that it would reduce the royalty payments to 30% if they negotiated a new licensing agreement, but no new agreement was reached. Joshua Plummer testified, without objection, that Utopia never obtained the renewed or new license agreement and thus received no consideration for any reduction in the royalties. Pro-Med moved for a directed verdict on the royalties, contending that the stipulation reduced the royalties to 30%, but the trial court denied the motion, noting that the language was difficult to construe. Then, during Pro-Med’s case, a series of emails between Dr. McHale of Utopia and Thomas Grossjung of Pro-Med were introduced in which McHale first agreed to a reduction of royalties to 30% in a new three-year contract, but Grossjung objected and made a counter offer, which McHa-le did not accept. Pro-Med also read the stipulations to the jury, and the court instructed the jury to determine the royalty percentage. During deliberations, the jury requested to reread the stipulations and then determined on the jury verdict form that Utopia was entitled to 50% and not 30% of revenues.
The court erred in granting a JNOV based upon the stipulation. The stipulation did not unambiguously state that Utopia had agreed to a reduction of royalties even if no renewal agreement were obtained. Instead, it was part of the negotiations. The parties went back and forth .on the terms. Even after McHale thought he had an agreement on the terms, Grossjung then disagreed and scuttled that agreement.
Moreover, in attempting to ascertain the meaning of the stipulation, we examine it “in accordance with its spirit, in furtherance of justice, in the light of the *563 circumstances surrounding the parties, and in view of the result that they were attempting to accomplish.” Travelers, 576 So.2d at 1350. In Travelers, the court refused to countenance the interpretation that VES gave to the stipulation in that case, because Burger King would have nothing to gain by admitting sole liability. Id. at 1351. Similarly, in this case, why would Utopia stipulate to reduce the royalties without any consideration of a new agreement? It is clear to us, and apparently to the jury, that Utopia’s agreement, and thus the stipulated fact, was that Utopia would agree to the reduction of royalties only if negotiations came to fruition. This result is also consistent with how preliminary agreements in contract negotiations are treated. “Preliminary negotiations designed to lead to an agreement do not, by themselves, constitute an agreement, as there is no mutuality of obligation or consideration.” Spigler v. Southeastern Publ. Serv. Co., 610 So.2d 521, 522 (Fla. 3d DCA 1992).
Based upon the foregoing, we conclude that the trial court did not follow the standard of review for a JNOV, as it did not construe the evidence in a light most favorable to the non-moving party, Utopia, nor did it resolve conflicts in favor of Utopia. By failing to adhere to these principles, it erred- in overturning the jury’s finding on this issue. The jury, itself considered the stipulation and determined, in accordance with the evidence, that Utopia had not agreed to the reduction. The jury’s findings should be reinstated.

Motion in Limine

Prior to trial, Pro-Med filed a motion in limine to preclude Utopia from offering evidence of revenues received after the expiration of the agreement on the electronic product. Pro-Med contended that the license agreement had only a five-year term, from October 1, 2001, to September 30, 2006. According to Pro-Med, once the contract expired, Utopia could not recover under the agreement. The trial court granted the motion in limine, ruling that Utopia was unable to receive royalties after expiration of the agreement, because the contract required Pro-Med to serve a notice of continuation of the contract, which Pró-Med never did. We disagree and reverse.
We deal with the interpretation of the licensing agreement between Pro-Med (referred to in the contract as Clinical) and Utopia. As such, the following principles apply:
The interpretation of a contract is a matter of law for the court, and is therefore a subject of de novo review. DEC Elec., Inc. v. Raphael Constr. Corp., 558 So.2d 427, 428 (Fla.1990); Gilman Yacht Sales, Inc. v. FMB Inv., Inc., 766 So.2d 294, 296 (Fla. 4th DCA 2000). “In construing a contract, the legal effect of its provisions should- be determined from the words of the entire contract.” Sugar Cane Growers Coop. of Fid., Inc. v. Pinnock, 735 So.2d 530, 535 (Fla. 4th DCA 1999). “All the various provisions of a contract must be so construed, if it can reasonably be done, as to give effect io each.” Paddock v. Bay Concrete Indus. Inc., 154 So.2d 313, 315 (Fla. 2d DCA 1963). In the event- that the language of a contract is clear and unambiguous) the court will enforce such contract according to its terms. Id. at 316.
Avatar Dev. Corp. v. De Pani Constr., Inc., 834 So.2d 873, 876 n. 2 (Fla. 4th DCA 2002).
Section 5.1 of the contract provided that if an end-user using Pro-Med Maximus—either paper or electronic — continued to use it after the expiration of the agreement, Pro-Med was required to pay royalties:
*564 Clinical shall pay to Utopia a Royalty on each Pro-Med Maximus Module licensed during the License Term, in the amounts set forth on Exhibit B; to the extent that End-User rights continue after any expiration or termination hereof, royalties will continue to apply as stated herein, on those Pro-Med Maxi-mus Modules that are licensed during the License Term but still used thereafter.
Although the court and Pro-Med looked to Section 10,4 of the license agreement, that section must be construed together with Section 10.3:
10.3 Cessation of Use of Licensed Materials on ... Expiration .... After any termination or expiration of this Agreement, neither party shall have the right to use the Proprietary Information or intellectual property of the other party, and Clinical shall promptly cease use of the Licensed Materials (or any derivatives thereof which employ or incorporate Licensed Materials, in whole or in part) and shall return the Licensed Materials (and all copies thereof) to Utopia; provided that in any event Clinical’s End-Users will still enjoy the right to use the Pro-Med Maximus Module in accordance with Section 10.4 below, upon Clinical’s compliance with the terms thereof.
10.4 Survival. Notwithstanding any expiration or termination of this Agreement, - the following Sections and Articles shall survive, along with all definitions required thereby:, Section 3.1, Article' 5,' and Articles 8 through 11. Furthermore, so long as the Agreement is not terminated by Utopia for cause pursuant to Section 10.2 above, after termination or expiration of this Agreement, then upon written notice delivered by Clinical of its intent to have End-User rights continue post-termination or post-expiration (a “Continuation Notice”), Clinical’s then-existing End-Users shall continue to enjoy the right to use and operate the Pro-Med Maximus Module. For such Continuation Notice and the associated rights of continuation for End-Users to be effective hereunder,’ .Clinical must affirm, at the time of termination or expiration and in a signed writing for the benefit of Utopia, that it will continue to pay and report royalties to Utopia according to the terms hereof, for as long as any such End-Users continue to use the Pro-Med Maximus Module.
Pro-Med asserts that Utopia was unable, as a matter of law, to recover damages based on sales of the product which took place after: expiration of the license agreement because Pro-Med never sent the written “continuation notice” which section 10.4 requires. This misreads the contract and ignores both Section 5.1 and 10.3 of the contract. Section 5.1 obligates Pro-Med to pay royalties for end-users’ continued use of the licensed materials after expiration of the contract. According to Section 10.3, if the contract expires, Pro-Med has no right to the use of Utopia’s products without the continuation agreement. Its end-users have the right to continued use of the product only if Pro-Med signs the continuation agreement. Thus," Pro-Med would not be entitled to any portion of the revenues generated from the end-users from Utopia’s licensed materials without its agreement.
Section 10.4 provides that Pro-Med’s end-users’ use may continue upon Pro-Med serving a continuation notice. This notice is expressly for the benefit of Utopia, not Pro-Med. Pro-Med actually breached Section 10.3 of the contract by collecting revenues from its end-users after expiration of the contract without payment of royalties to Utopia pursuant to *565 Section 5.1 and providing the notice of continuation. Utopia could have sought as damages the entire amount of revenues obtained from the licensed products. Instead, Utopia, through its complaint, waived the requirement of written notice and sought only to collect its share of royalties from end-user revenues to which it was entitled pursuant to Section 5.1.
The court erred in failing to construe all of these provisions of the contract together. Granting the motion in limine on the ground that Pro-Med failed to send notice to Utopia of its intent to continue the contract, thus eliminating Utopia’s royalties for the use of its own product, was error. :
Based upon the foregoing, we reverse the final judgment and remand for further proceedings to determine the amount of post-expiration revenues to which Utopia is entitled. Because of our reversal of the JNOV, the court must give effect to the jury determination that all royalties shall be computed at 50% of revenues in accordance with the contract. As the result of our determination of the foregoing issues, we do not address the remaining issue raised in this appeal.
CIKLIN, C.J., and GERBER, J., concur.

. It includes templates for documenting various types of examinations, including general, cardiologic, gastrointestinal, genito-urinary, musculoskeletal, neurologic, pediatric, psychiatric, and similar examinations.