DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JENNIFER M. CARRASQUILLO, M.D.,**
**CAROLINA GLADYS VALDES, M.D.,** and **HOLY CROSS HOSPITAL,**
**INC.** d/b/a **HOLY CROSS MEDICAL GROUP,**
Appellants/Cross-Appellees,

v.

**LAWRENCE PETER METZLER, JR.,** as Personal Representative of the
**ESTATE OF WENDY M. METZLER,**
Appellee/Cross-Appellant.

Nos. 4D2022-2019 and 4D2022-2078

[January 3, 2024]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carlos A. Rodriguez, Judge; L.T. Case No. CACE19-022758.

John Goran, Stewart G. Milch, and R. Ryan Rivas of Hall Booth Smith, P.C., Miami, and Austin Atkinson of Hall Booth Smith, P.C., Atlanta, Georgia, for appellants/cross-appellees.

Philip D. Parrish of Philip D. Parrish, P.A., Miami, and Sean F. Thompson, Scott S. Liberman, Ivan F. Cabrera, and Brent M. Reitman of Liebman Cabrera Thompson & Reitman, PLLC, Fort Lauderdale, for appellee/cross-appellant.

DAMOORGIAN, J.

This appeal and cross-appeal arise from a medical malpractice action filed by Lawrence Peter Metzler ("Plaintiff"), as personal representative of the Estate of Wendy Metzler, against Dr. Jennifer Carrasquillo, Dr. Carolina Valdes (collectively the "Defendant Doctors"), and Holy Cross Hospital, Inc. ("Holy Cross")[1] in connection with the death of his wife, Wendy Metzler. The lawsuit alleged the Defendant Doctors were negligent in failing to timely refer Mrs. Metzler for a chest CT scan, a delay which deprived Mrs. Metzler of a chance to have life-saving surgery. The case proceeded to a jury trial and resulted in a complete defense verdict.

---

[1] Holy Cross was sued on a theory of vicarious liability.

Following the verdict, Plaintiff moved for judgment notwithstanding the verdict ("JNOV") as to both of the Defendant Doctors. The trial court ultimately granted the motion as to Dr. Carrasquillo but denied the motion as to Dr. Valdes. The trial court thereafter unilaterally determined Plaintiff suffered $1.125 million in damages and entered final judgment against Dr. Carrasquillo and Holy Cross in that amount.

On direct appeal, Dr. Carrasquillo and Holy Cross argue the trial court reversibly erred by: (1) granting the motion for JNOV as to Dr. Carrasquillo because sufficient evidence was presented at trial to support the jury's verdict; (2) striking the Defendant Doctors' standard of care expert; and (3) determining the amount of damages after granting the JNOV.

On cross-appeal, Plaintiff argues the trial court reversibly erred by: (1) denying the motion for JNOV as to Dr. Valdes; and (2) admitting evidence concerning the denial or delay of authorization of medical insurance coverage for an MRI study.

For the reasons discussed in this opinion, we reverse the order granting JNOV and the final judgment against Dr. Carrasquillo and Holy Cross and remand for entry of a final judgment consistent with the jury's verdict. We also affirm on all issues raised in the cross-appeal without further comment.

The evidence at trial established the following chronology of events leading to Mrs. Metzler's death. In March 2017, Mrs. Metzler was referred to Dr. Valdes, a neurologist, for a neurological workup after complaining of chronic back pain believed to have been potentially caused by a prior motor vehicle accident. Dr. Valdes recommended that Mrs. Metzler have a thoracic and lumbar MRI to diagnose the source of her pain. After a period of delay unattributed to Dr. Valdes, the MRI was performed on May 23, 2017.[2] At issue in this case is what transpired between May 24, 2017, and June 1, 2017.

On May 24, a neuroradiologist reviewed the MRI and noticed a "lesion . . . sitting . . . between the spine and the aorta." However, it was difficult to see the lesion clearly on the MRI. This lack of clarity in the MRI caused the neuroradiologist to reach out to a radiologist for a second opinion. The radiologist mentioned that, given the patient's history of a prior motor vehicle accident, a "chronic intramural hematoma [wa]s a possibility." The

_____

[2] Mrs. Metzler's health insurance carrier denied authorization for the MRI and instead authorized six weeks of physical therapy first. Dr. Valdes attempted to obtain insurance approval through a peer-to-peer review, which was denied.

neuroradiologist and radiologist exchanged several e-mails about possible diagnoses and agreed that a chest CT scan should be the next diagnostic step. The neuroradiologist's report ("MRI report") mentioned that it was difficult to localize the origin of the lesion on this type of exam and included three possible differential diagnoses: (1) a neoplastic process, (2) an unusual inflammatory/granulomatous lesion, or (3) possibly a chronic aortic intramural hematoma given the history of a prior motor vehicle accident. Significantly, there was no mention of a "critical finding" in the MRI report requiring the chest CT scan to be "urgent."

The neuroradiologist faxed her report to Dr. Valdes' office and then called the office as well. It is undisputed that the patient care coordinator who answered the phone did not tell anyone about the phone call or otherwise make a notation of the phone call in Mrs. Metzler's patient file. Unbeknownst to the neuroradiologist, Dr. Valdes was on vacation. On May 26, neurologist Dr. Carrasquillo, who was covering for Dr. Valdes, reviewed the report. Within minutes of reviewing the report, Dr. Carrasquillo directed her assistant to get the chest CT scan approved. Dr. Carrasquillo did not request that the chest CT scan be performed immediately because the MRI report did not mention a "critical finding." Dr. Carrasquillo also called Mrs. Metzler and left a message advising her of the need for a chest CT scan. The patient file was then tasked back to Dr. Valdes.

On May 30, Dr. Valdes returned from vacation but did not see the MRI report or get a message that the neuroradiologist had called her. On May 31, Dr. Valdes reviewed the report, ordered a chest CT scan, and spoke to both Mrs. Metzler and her primary care physician. On June 1, Mrs. Metzler was brought to the emergency room where a chest CT scan was performed. The chest CT scan revealed a penetrating aortic ulcer. The ulcer ruptured twenty minutes after the chest CT scan was performed and Mrs. Metzler passed away at the hospital.

At trial, Plaintiff introduced the testimony of three relevant expert witnesses. The first expert to testify was Dr. Flanigan, a vascular surgeon. Dr. Flanigan testified as to causation, opining that had Mrs. Metzler's aortic condition been diagnosed sooner, the ulcer could have been repaired and she would not have died. On cross-examination, Dr. Flanigan acknowledged that the aortic condition present in this case is uncommon and would not be an immediate consideration when a patient is complaining of back pain.

Next, Plaintiff introduced the testimony of Dr. Gaensler, a radiology expert. This expert testified that both the neuroradiologist and radiologist

breached the standard of care by not recognizing the urgency of the situation when they reviewed the MRI and by not immediately ordering an expedited chest CT scan. This failure, in turn, led to a "failure to communicate the gravity of the situation" to the Defendant Doctors. Specifically, Dr. Gaensler testified that listing the intramural hematoma as the third possible diagnosis in the MRI report made the situation seem less severe than it was and failed to communicate the urgency of Mrs. Metzler's condition. Dr. Gaensler also agreed that "the urgency on [the MRI] report was not palpable in terms of ordering a CT scan."

Finally, Plaintiff introduced the testimony of Dr. Gold, a neurologist. This expert opined that the failure to appreciate the urgency of the need for a chest CT scan fell below the standard of care. Specifically, Dr. Gold opined that because the MRI report listed an intramural hematoma as a possible diagnosis, the report indicated a medical emergency and the Defendant Doctors' failure to order an urgent chest CT scan was therefore a departure from the standard of care. On cross-examination, Dr. Gold acknowledged that the MRI report described the hematoma as "chronic" as opposed to acute and that the words "urgent" and/or "stat" did not appear in the report. Moreover, Dr. Gold also acknowledged that once Dr. Carrasquillo was made aware that the MRI report was in the office, it took her only twenty-one minutes to review the report and start the process to get the chest CT scan approved.

The Defendant Doctors testified in their own defense. Consistent with Plaintiff's neurology expert, the Defendant Doctors both testified that there was nothing in the MRI report indicating Mrs. Metzler's condition was critical and/or that a chest CT scan was urgently needed. In relevant part, Dr. Carrasquillo testified the report did not come stamped with a critical finding and, to her knowledge, was not coupled with a direct phone call, two things which typically occur when there is a critical finding. Dr. Carrasquillo also testified that her specialty is the brain and spine and she therefore deferred to the radiologists who reviewed the MRI. Had the report been stamped critical or urgent, Dr. Carrasquillo testified she would have ordered the chest CT scan as an urgent scan. Dr. Valdes similarly testified that nothing in the MRI report suggested a medical emergency. Rather, the report recited only that the lesion was possibly a chronic aortic intramural hematoma given the history of a prior motor vehicle accident, indicating a long-standing problem. Overall, the Defendant Doctors both testified that their respective actions and treatment of Mrs. Metzler were reasonable given the information provided to them in the MRI report.

Before closing arguments, Plaintiff moved for a directed verdict. The trial court reserved ruling. The case was presented to the jury and after two hours of deliberation, the jury returned a complete defense verdict.

Following the verdict, Plaintiff moved for JNOV on the ground that the Defendant Doctors presented no expert witness to refute Dr. Gold's testimony that their failure to appreciate the urgency of the need for the chest CT scan fell below the standard of care. The trial court ultimately granted the motion for JNOV as to Dr. Carrasquillo but denied the motion as to Dr. Valdes. In granting the motion as to Dr. Carrasquillo, the trial court reasoned Dr. Carrasquillo "shuffled" responsibility for Mrs. Metzler's care and that no reasonable jury "would return that verdict. There's no basis for that in law." The trial court thereafter unilaterally determined Plaintiff suffered damages in the amount of $1.125 million and entered judgment in that amount against Dr. Carrasquillo and Holy Cross. This appeal and cross-appeal follows.

"In reviewing an order granting a judgment notwithstanding the verdict ('JNOV'), an appellate court must view the evidence in a light most favorable to the non-moving party, resolve all conflicts in the evidence in favor of the non-movant, and construe every reasonable conclusion which may be drawn from the evidence in favor of the non-movant." *Hancock v. Schorr,* 941 So. 2d 409, 412 (Fla. 4th DCA 2006). "A JNOV is appropriate only in situations where there is no evidence upon which a jury could rely in finding for the non-movant." *Id.*

In the present case, our review of the evidence adduced at trial leads us to the inescapable conclusion that the evidence was conflicting on the issue of whether the Defendant Doctors breached their standard of care. As reflected in the facts, the crux of Plaintiff's claim against the Defendant Doctors was that they failed to recognize the urgency for a chest CT scan. To that end, Plaintiff primarily relied on the expert testimony of Dr. Gold who opined that because the MRI report listed an intramural hematoma as a possible diagnosis, the Defendant Doctors should have recognized the report indicated a medical emergency. However, Dr. Gold also acknowledged during cross-examination that the MRI report described the hematoma as "chronic" as opposed to acute and that the words "urgent" and/or "stat" did not appear in the report. Moreover, Plaintiff's own radiology expert testified that listing the intramural hematoma as the third possible diagnosis in the MRI report made the situation seem less severe than it was, which in turn led to a "failure to communicate the gravity of the situation" to the Defendant Doctors. The radiology expert further agreed that "the urgency on [the MRI] report was not palpable in terms of ordering a CT scan." Finally, Plaintiff's vascular surgeon expert

acknowledged that the aortic condition present in this case is uncommon and would not be an immediate consideration when a patient is complaining of back pain. In other words, there were discrepancies within the testimony of Plaintiff's own expert witnesses as to whether the MRI report conveyed a medical emergency. These discrepancies were further accentuated by the testimony of the Defendant Doctors who both testified that nothing in the MRI report indicated Mrs. Metzler's condition was critical and/or that a chest CT scan was urgently needed.

Simply put, the experts' testimony, together with the Defendant Doctors' individual denials, created conflicts in the evidence which only the jury, and not the trial court, could resolve. Accordingly, by granting the motion for JNOV as to Dr. Carrasquillo, the trial court committed reversible error by failing to resolve the conflicts in the evidence in favor of the non-moving party. *See Aurbach v. Gallina*, 721 So. 2d 756, 758 (Fla. 4th DCA 1998) ("[A] trial judge may not sit as a seventh juror, thereby substituting his or her resolution of the factual issues for that of the jury." (citation and internal quotation marks omitted)); *Johnson v. Swerdzewski*, 935 So. 2d 57, 62 (Fla. 1st DCA 2006) ("By granting the extreme sanction of dismissal of the cause after the jury had returned a verdict for appellant, the court essentially assumed the role of a seventh juror by making a credibility determination contrary to that reached by the jury . . . .").

Plaintiff nonetheless argues that pursuant to section 766.102, Florida Statutes (2022), in order to avoid entry of JNOV against them, the Defendant Doctors were required to present independent expert testimony on the standard of care issue. Specifically, Plaintiff argues the Defendant Doctors were required to present expert testimony to oppose Dr. Gold's testimony that the failure to timely refer Mrs. Metzler for a chest CT scan fell below the prevailing professional standard of care. In support of his argument, Plaintiff points to the language in section 766.102(5)(a), Florida Statutes (2022), stating: "If the health care provider against whom *or on whose behalf the testimony is offered* is a specialist, the expert witness must . . . ." (emphasis added). Based on the italicized language, Plaintiff maintains the statute "requires expert testimony to support *or oppose an allegation* of the breach of standard of care."

We reject Plaintiff's reading of section 766.102(5), Florida Statutes. Section 766.102(5) governs the qualifications an expert witness needs to testify on the standard of care. Although those qualifications certainly apply to experts testifying on behalf of a defendant health care provider, nothing in section 766.102(5) *requires* a defendant health care provider to present independent expert testimony to oppose an allegation of the breach of standard of care. Such a requirement would improperly shift

the burden of proof and contravene the language in the statute providing that "the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider." § 766.102(1), Fla. Stat. (2022); *see also Saunders v. Dickens*, 151 So. 3d 434, 441 (Fla. 2014) ("[I]n a medical malpractice action, *the burden is on the plaintiff* to establish that the care provided by the physician was not that of a reasonably prudent physician." (emphasis added)). Once Plaintiff presented expert testimony on the standard of care issue, the jury was free to reject the testimony of the expert witnesses and accept only the denials of the Defendant Doctors to return a defense verdict. *See Haas v. Zaccaria*, 659 So. 2d 1130, 1133 (Fla. 4th DCA 1995) ("[S]urely the defendants' own individual denials of personal negligence would have permitted the jury to find that neither was negligent. The jury would have been free to reject the testimony of plaintiff's expert witnesses and accept only the denials of the defendants to return a verdict of not guilty for both defendants."). Indeed, even Plaintiff's attorney acknowledged during closing arguments that standard jury instruction 601.2(b) permitted the jury to either accept or reject the expert witness testimony. *See* Fla. Std. Jury Instr. (Civ.) 601.2(b).

Although moot in light of our holding, we are compelled to clarify that even if we were to affirm the final judgment granting JNOV as to Dr. Carrasquillo, under no circumstances could the trial judge unilaterally determine and award damages. Where the jury has considered the evidence and awarded zero damages, it is not the trial judge's role to reweigh the evidence and substitute his or her own judgment in determining damages. *See Melgen v. Suarez*, 951 So. 2d 916, 918 (Fla. 3d DCA 2007) ("As the trial judge cannot reweigh the evidence and substitute her own judgment for that of the jury, we conclude that the trial court erred in effectively overruling the jury's determination of [plaintiff's] entitlement to zero damages."). Notably, even Plaintiff concedes the trial court erred in awarding damages.

*Affirmed in part, reversed in part, and remanded with instructions.*

MAY and FORST, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

7